Strafford, }
Oct. 5, 1920. }

## BOSTON & MAINE RAILROAD *v.* GREAT FALLS MANUFACTURING CO.

By the common law and Laws 1853, c. 1277, it is the duty of a carrier to carry for a fair price and to treat all shippers substantially alike.

An agreement by a carrier to render ferry service for a price substantially less than that charged other shippers for a like service or an agreement not to make a separate charge for ferry service, such separate charge being required by law, is so far illegal that the carrier may recover the required charge.

If a carrier has filed with the federal or state commissioners a tariff of rates for ferry service, an order of the commission permitting a special charge for such service is conclusive, in an action between the carrier and a shipper, as to whether such separate charge shall be made.

An agreement by a carrier to render ferry service to a shipper, for all time, without a separate charge therefor in consideration of a conveyance of land is illegal as discriminatory against other shippers if the fair annual rental of the land is only a few hundred dollars and the cost to the shipper for such service, on the basis of the legal charge to other shippers for like service, would be between two and three thousand dollars annually.

The duty of a carrier to treat all shippers alike requires the filing of a tariff of
separate charges for ferry service, if such charge is necessary in order to avoid
discrimination.

ASSUMPSIT, to recover for ferrying, that is, for receiving and delivering on the tracks in the defendants' yard cars containing freight shipped in less than carload lots. Trial by the court and verdict for the plaintiffs.

The defendants admit that the plaintiffs performed the service in question and defend on the ground that they have been paid for performing them.

The plaintiffs made an agreement with the defendants, when they built their road into Somersworth in 1843, under which they occupied their right of way until 1853. In that year, the Great Falls & Conway railroad filed a location between their tracks and the defendants' plant, in part over land the plaintiffs were occupying and in part over other land of the defendants. To meet this situation, the parties made an agreement November 7, 1853, by the terms of which the plaintiffs agreed among other things to receive and deliver cars containing the defendants' freight to and from the tracks in their yard, provided the defendants procured the right for them to cross the Great Falls & Conway company's tracks in a way not to interfere unreasonably with the business of either road.

Exceptions were taken by the defendants to various rulings and findings of the court, and a bill of exceptions was allowed by *Allen*, J., at the September term, 1918, of the superior court.

There was also an action by the Great Falls Manufacturing company to recover from the Boston & Maine R. R. for the occupation by the railroad of the land included in the above-mentioned agreement.

*Snow, Snow & Cooper, Hughes & Doe* and *Branch & Branch* (*Mr. Conrad E. Snow* orally), for the plaintiffs.

*Choate, Hall & Stewart* (of Massachusetts) and *Jackson & Hurlburt* (*Mr. Charles O. Pengra*, of Massachusetts, orally), for the defendants.

YOUNG, J. It is not clear just what is intended by the finding that while the plaintiffs agreed to make no charge for doing the defendants' ferrying, that agreement was no part of the consideration they gave the defendants for the conveyance of 1853. In other words, it is not clear whether by it is intended that both parties understood that the

expense incident to ferry service was a part of the general overhead
expenses and that the charge for doing it was included in the freight
rate, or whether by it is intended that the plaintiffs agreed (a) to do
the defendants' ferrying, and (b) to make no charge for doing it, even
though they charged other shippers for that service. That is, it is
not clear whether all that is intended is that the plaintiffs agreed to
do the defendants' ferrying in consideration of their conveyance of
the land to the plaintiffs and to include the expense of doing it in
the general freight rate or that they agreed to give the defendants a
lower rate than they gave other shippers. It will be necessary there-
fore to consider the plaintiffs' contention that if the latter was the
agreement they made, it was so far illegal that the defendants can
neither enforce it nor set it up as a defence to this suit. The test
to determine whether such an agreement is *ultra vires* is to inquire
whether the common law or the statutes of this state forbade it,
either at the time the agreement was made or in 1912 when the
plaintiffs filed the tariff, making a separate charge for ferry service.

The plaintiffs were incorporated under the laws of this state and
can legally do such acts and such acts only as the common law and
the statutes permit. That is, they owe all who employ them the
duties the modern common law imposes on a common carrier, as
well as those the seventeenth century common law imposed on those
exercising one of the common employments. The test, therefore, to
determine whether either an agreement to give the defendants a
better rate than they gave other shippers, or one not to make a
separate charge for ferry service, was legal either in 1853 or 1912, is
to inquire as to what it was permissible for a common carrier to do
on those dates.

The seventeenth century common law made it the plaintiffs' duty
to carry for all who had occasion to employ them for a fair price, and
the modern common law as well as the statutes in force in 1853
(Laws 1853, *c.* 1277) made it their duty to treat all shippers sub-
stantially alike. *McDuffie* v. *Railroad*, 52 N. H. 430, 457. If, there-
fore, the agreement the parties made contemplated that the plaintiffs
should do the defendants' ferrying for a price which was substantially
less than what they charged other shippers for that service, the agree-
ment was illegal in the sense that it was one the parties had no power
to make; or in the sense in which some of the agreements a minor
makes are illegal; and this is also true if the agreement contemplated
that the plaintiffs should make no special charge for ferry service
and ferrying is a service for which such a charge should be made.

The test to determine whether ferrying is a service for which a separate charge should be made, or whether the expense incident to doing that work should be included in the general overhead, and charged *pro rata* to all shippers, is to inquire whether ferrying is a special benefit to a class of shippers or whether the expense incident to doing a shipper's ferrying is substantially greater than that incident to the work the plaintiffs do for all other classes of shippers without a separate charge. In other words, the test to determine whether a separate charge should be made for that service is to inquire whether that must be done if all shippers (those who do and those who do not need that service) are to be treated substantially alike, and that is also the test to determine whether such a charge is permissible. The issues, therefore, which were raised when the plaintiffs filed the tariff of 1912 with the interstate commerce and the New Hampshire public service commissions were (1) whether ferrying was a service for which it was necessary to make a separate charge if the plaintiffs were to treat all shippers substantially alike; and if it was such a service (2) what was a fair price for doing the work. Since this is so, the order of the commissions permitting the plaintiffs to make a separate charge for ferry service is conclusive, in so far as the parties to this proceeding are concerned, of the fact that ferrying is a service for which a separate charge should be made; and, as will appear more fully later, the fact that it is necessary to make a separate charge for that service in order to treat all shippers substantially alike is conclusive of the fact that it was the plaintiffs' duty to file the tariff of 1912 asking the commissioners to permit them to make such a charge.

It is true that the question whether the price the defendants say they paid the plaintiffs for doing their ferrying is substantially the same as other shippers paid for that service is one of fact, but it is also true that the question whether there is any evidence to sustain such a finding is one of law. Consequently, the question for this court on this branch of the case is whether there is any evidence to sustain a finding that the fair rental value of the land the plaintiffs occupied under the agreement of 1853 (the price the defendants say they paid the plaintiffs for doing their ferrying) is substantially equal to what they would have paid for doing that work if the agreement of 1853 had not been made; that is, if they had paid the same price as other shippers paid for ferry service. The evidence relevant to that issue tends to the conclusion that the fair rental value of this land was at most but a few hundred dollars a year while it would

have cost the defendants between two and three thousand dollars a year for doing their ferrying if they had paid what other shippers paid for that service. If, therefore, the agreement of 1853 contemplated that the plaintiffs should do the defendants' ferrying until the end of time for the use of the land, it is obvious that it cannot be found that the price they say they paid for ferry service was substantially the same as that charged other shippers for that service.

The defendants contend that if it is true that they were paying less for ferry service than other shippers, it does not follow that the agreement of 1853 is not an answer to this suit. In other words, they say that even if it is true that the plaintiffs must charge them the same price for doing their ferrying that they charge other shippers, it comes to nothing in so far as their rights in this action are concerned, for the plaintiffs were under no legal obligation to make a separate charge for ferry service. If this contention was sound, it would perhaps be an answer to this suit, but is it sound?

As we have seen, the common law and the statutes in force in 1853 as well as those in force in 1912 (P. S., c. 160, s. 1; Laws 1911, c. 164), made it the duty of the plaintiffs not only to carry for all for a fair price but also to treat all shippers substantially alike.

This duty carries with it the duty of doing whatever is reasonably necessary to enable them to treat everyone alike. Since this is so, they could no more legally agree not to make a separate charge for ferry service, if it is necessary to make such a charge in order to treat all shippers substantially alike, than they could legally agree to do the defendants' ferrying for a price which was substantially less than the price they charged other shippers for that service; for the necessary effect of either of their agreements would be to favor the defendants at the expense of other shippers, and any scheme or device which produces that result is illegal. This is true even though it is not a crime for a railroad to agree to carry poor persons and their property without charge. It would, however, be a waste of time to consider the legality of such a contract; for the defendants were not objects of charity in 1853 and the plaintiffs were not engaged in a charitable undertaking when they made this agreement.

In short, the rule of the common law which makes it the duty of a common carrier to carry for all for a fair price and to treat all shippers substantially alike, made it the plaintiffs' duty in 1912 to make a special charge for ferry service, if that was necessary to enable them to treat all shippers substantially alike, and as we have seen the

findings of the rate-making commissions include a finding that ferrying is a service for which a separate charge should be made, and is conclusive of the fact that it was the plaintiffs' duty to ask the rate-making commissions for permission to make such a charge.

In short, the rule of the common law and the statutes of this state which make it the plaintiffs' duty to treat all shippers substantially alike, made it their duty to file the tariff of 1912.

It must be held, therefore, that in so far as the agreement of 1853 contemplated either that the plaintiffs should do the defendants' ferrying for all time for the use of the land, or that they should not file the tariff of 1912, it is so far illegal that no damages can be recovered for the plaintiffs' failure to perform it.  By this is not intended that, if the defendants benefited the plaintiffs by anything they did in reliance on the plaintiffs' promise to do their ferrying for the use of the land, they cannot recover ˏthe value of that benefit to the plaintiffs in this action, but that an *ultra vires* contract cannot be enforced by either party.  The defendants, however, contend that as it was permissible for them to do all they were to do by the terms of the agreement, having done it they should be permitted to recover damages from the plaintiffs, measured in the terms of the contract.  In other words, they seem to contend that when one of the parties to an agreement which the other party had no power to make has done all that he agreed to do, the agreement stands in so far as he is concerned, just as it would if the other party had had power to make it; and that if the other party refuses to do what. he agreed to do, the party who has performed can recover what the agreement was worth to him — not what the benefit was worth to the other party.  This is but another way of saying that when one of the parties to an illegal agreement has in good faith done what he agreed to do, the contract becomes so far legal that he can enforce it, if not in the same way, still to the same extent in so far as damages are concerned as he could if the other party had had power to make it.  That, however, is not the rule in this state.  *Hall* v. *Butterfield*, 59 N. H. 354.  It will not be necessary in this case, however, to consider whether, when one party to an *ultra vires* contract has done what he agreed to do, the other party will be permitted to defend on the ground that the contract was *ultra vires*, without offering to return what he received for the illegal agreement, for the court has found that the plaintiffs received nothing for their agreement to make no charge for doing the defendants' ferrying.

The defendants excepted to this finding but the only question

raised by that exception is as to the sufficiency of the evidence to sustain it. The evidence relevant to that issue tends to prove that at the time the agreement was made the Great Falls & Conway railroad was about to build their road in such a way as to separate the defendants' plant from the plaintiffs' road and that at that time ferrying was a service for which no railroad made a separate charge.

While it is probable that the defendants might be willing to pay for connecting their tracks with the plaintiffs' tracks, it is improbable that they would agree to pay the plaintiffs for a service they were accustomed to perform for everyone without charge. Instead, therefore, of there being no evidence to sustain the court's finding that the defendants gave the plaintiffs nothing for their promise to make no charge for ferrying, that is the only finding of which the evidence is fairly capable. In other words, although it is probably true that both parties understood that the plaintiffs would make no charge for doing the defendants' ferrying, it by no means follows that the plaintiffs' agreement to make no charge for that service was part of the consideration the plaintiffs gave for the land. In fact, if the words the parties used are read in the light of the surrounding circumstances and given any meaning of which they are fairly capable, it is clear that what the plaintiffs agreed to do and all they agreed to do was to do the defendants' ferrying. In other words, although it is undoubtedly true that in 1853 both parties expected that no charge would be made for doing the defendants' ferrying, that expectation was not incorporated into the agreement, for the words used are, the plaintiffs agree "to deliver and receive the cars, containing said company's freight, to and from said company's track in the yard" — not to receive and deliver such cars without expense to them. In fact, there is nothing either in the agreement itself or in the circumstances under which it was made which even tends to the conclusion that the price the plaintiffs were to receive for doing the defendants' ferrying was considered by either party. From all that appears, the defendants' purpose in making their agreement was to connect the tracks in the yard with the plaintiffs' tracks. Both parties understood that the cost of ferry service was a part of the general overhead expenses and included in the general freight rate, and there is no more reason for saying that the plaintiffs agreed not to make a separate charge for ferrying than for saying that they agreed not to change any of the freight rates in force at that time.

The agreement, therefore, should be construed as though it read,

the plaintiffs agree to connect their tracks with the tracks in the defendants' yard and to do their ferrying on exactly the same terms as they do ferrying for other shippers. The fact the agreement contains no mention of the price for which the work was done strengthens this conclusion, for if the defendants had been looking ahead to the time when a separate charge would be made for ferry service, it is probable the agreement would have contained apt words to show that the plaintiffs were never to make a charge for doing their ferrying; but instead of the agreement containing such a clause, the words used are more capable of the construction that the plaintiffs were to do the defendants' ferrying on the same terms as they did ferrying for other parties, than of the one that they were to make no charge for doing it.

*Exceptions overruled.*

All concurred.